UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JESSICA HERNANDEZ,

                                        Plaintiff,            No. 04-CV-6491 CJS

            -vs-
                                                             DECISION AND ORDER

INDUSTRIAL MEDICINE ASSOCIATES,

                                        Defendant.

_____


APPEARANCES

For plaintiff:            Christina A. Agola, Esq.
                          730 First Federal Plaza
                          28 East Main Street
                          Rochester, New York 14614

For defendant:            Robert C. Weissflach, Esq.
                          Harter, Secrest & Emery LLP
                          1600 Bausch & Lomb Place
                          Rochester, New York 14604-2711


INTRODUCTION

    This is an action alleging employment discrimination pursuant to Title VII of the

Civil Rights Act of 1964 ("Title VII), as amended, 42 U.S.C. § 2000e *et seq.*, and the New

York Human Rights Law ("NYHRL"), Executive Law § 290 *et seq.*.  Now before the Court

is defendant's motion [#23] for summary judgment.  For the reasons that follow, the

application is granted in part and denied in part.

1

BACKGROUND

Unless otherwise noted, the following are the undisputed facts of this case, viewed in the light most favorable to the plaintiff.  Defendant Industrial Medicine Associates ("IMA") is a professional corporation which provided disability evaluations, independent medical examinations, and other medical services.  IMA employed plaintiff Jessica Hernandez ("Plaintiff") as the sole receptionist and as a Spanish-language translator, in IMA's office in Rochester, New York, from May 16, 2002 until September 9, 2004, at which time IMA terminated her employment.

At all relevant times, IMA's Regional Manager was Cathy Toeper ("Toeper").  In that capacity, Toeper managed IMA's offices in Rochester, Buffalo, Jamestown, and Corning, and was the highest-ranking official in the Rochester office. (Toeper Dep. 13-14) Toeper's supervisor was Jeffrey Collett ("Collett"), IMA's Vice President, who worked primarily in another city, and visited IMA's Rochester office on an as-needed basis.  In addition to plaintiff and Toeper, IMA employed various office personnel including Toeper's administrative assistant, Elvira Torres ("Torres"), and a medical assistant named Dana Kelly ("Kelly").  IMA also employed a number of medical doctors and psychologists to provide medical services to its clients.  It is undisputed that IMA's doctors and psychologists were independent contractors with no supervisory authority over plaintiff.

Plaintiff's work schedule was 8:30 a.m. to 5:00 p.m.  Lunch breaks for all employees were supposed to last only 30 minutes, however, Toeper would often allow up to 45 minutes. (Pl. Dep. 13)  Toeper would also routinely grant plaintiff and other employees permission to take even longer lunch breaks.

2

Employees were permitted to use office telephones to make personal telephone calls, but were asked to keep such calls to a minimum.  At the start of plaintiff's employment, Toeper was more lenient concerning personal phone use.  Subsequently, though, she admonished all of the employees to "lay low" with regard to personal calls, meaning that they should make personal calls only when the office was not busy. (Pl. Dep. 47)

IMA's offices consisted of a waiting room, examination rooms, and offices.  Clients and staff entered the waiting room from outside by passing through two doors.  During the day, these doors were not locked.  However, one of the doors would generally be locked in the evenings once the doctors were finished seeing patients, and then persons wishing to enter the waiting room would have to be "buzzed" in by someone at the receptionist's desk.  The waiting room was separated from the rest of the office by a unlocked wooden door beside the reception desk. (Torres Dep. 39-40)  Toeper frequently allowed employees to have visitors come through the waiting room and into the inner office space.

At all relevant times, IMA had, as part of its employee handbook, a written anti-discrimination policy which stated, in relevant part:

> Any employee with questions or concerns about any type of discrimination in the workplace is encouraged to bring these issues to the attention of his/her immediate supervisor or any officer of the Company.  Employees can raise concerns and make reports without fear of reprisal.  Anyone found to be engaging in any type of unlawful discrimination will be subject to disciplinary action, up to and including termination of employment.

Def. Ex. F, p. 8.  The policy further stated: "All employees are urged to report any behavior in the workplace that they feel constitutes harassment.  If you feel this situation

exists currently or has existed in the past, please contact your supervisor or the Human

Resources Manager.  You may also contact Jeff Collett, VP of Operations . . . ." *Id*. at 51.

A few lines later, the policy further stated: "Any supervisor or manager who becomes

aware of possible sexual or other unlawful harassment must promptly advise the

appropriate person(s) listed above who will handle the matter in a timely and confidential

manner." *Id.*  In a separate section of the employee handbook entitled "Employee

Relations," the handbook stated that employees who have "a complaint, suggestion, or

question about [their] job, working conditions, or the treatment [they] are receiving" should

bring their concerns to their supervisor, and that,

> [i]f the problem persists, you may put it in writing and present it to the
> Regional Manager, who will investigate and provide a solution or
> explanation.  It is recommended that you bring the matter to the Vice
> President of Operations as soon as possible after you believe that your
> immediate supervisor has failed to resolve the matter.

*Id*. at 7.   Toeper was primarily responsible for implementing the sexual harassment

policy in the Rochester office (Collett Dep. 10-11), and in that regard, she had a duty to

inform Collett of any sexual harassment that was occurring. (Toeper Dep. 22; Collett Dep.

16)

In or about May 2003, Dr. Zax ("Zax"), a psychologist employed by IMA, began

touching plaintiff inappropriately without her consent, and making inappropriate

comments to her.  As for the touching, plaintiff states that Zax would touch her buttocks

and shoulders, grab her waist, and intentionally brush up against her back with his body.

As for comments, plaintiff states that Zax would whisper statements of a sexual nature in

her ear, such as, "Were you a bad girl last night?  Would you be bad with me?"

Plaintiff states that she complained to Toeper about Zax's conduct on three

4

occasions, specifically, in May 2003, October 2003, and December 2003.  On two of these occasions, Torres accompanied plaintiff when she complained to Toeper, and confirmed that Zax touched plaintiff and made inappropriate comments. (Pl. Dep. 84-85)  Plaintiff contends that, each time she complained, Toeper told her that she would speak to Zax.  Plaintiff further states that Toeper told her that Zax had bothered other female employees, that these employees ignored Zax, and that plaintiff should also ignore him.  Toeper, however, contends that plaintiff only complained to her about Zax on one occasion, and that plaintiff asked her not to do anything about the situation, because she wanted to handle it herself.  Plaintiff denies that she ever asked Toeper to refrain from speaking to Zax.

During the period when Zax was harassing plaintiff, Collett visited the Rochester office on a few occasions.  Plaintiff knew that she could complain to Collett about Zax, but she did not do so because she was "scared" and "embarrassed."  In that regard, Collett testified that, pursuant to IMA's policies, there was no requirement that plaintiff complain to him if she had already complained to Toeper. (Collett Dep. 18-19) (Noting that IMA employees were free to "approach the individual that they were most comfortable with.")

Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on or about May 19, 2004.  In the complaint, plaintiff stated that Zax "persistently touches my butt and has said . . . things such as asking me if I was a bad girl last night."  The same day that she filed the EEOC complaint, plaintiff informed IMA's Human Resources department about Zax's harassment.  Collett learned of plaintiff's complaint that same day, and immediately contacted plaintiff by telephone.  The following

day Collett traveled to Rochester and interviewed various staff members, including

plaintiff, Zax, Toeper, and Torres, concerning plaintiff's allegations.  Collett then issued a

letter of reprimand to Zax, indicating that Zax had "demonstrated unprofessional

behavior," and on May 26, 2004, Zax issued a letter of apology to plaintiff.  No other

disciplinary action was taken against Zax.  Subsequently, Zax never said or did anything

inappropriate to plaintiff.  Nonetheless, plaintiff states that she was very uncomfortable

working around Zax, and that she "started getting real sick [emotionally]." (Pl. Dep. 99-

100)

On May 27, 2004, Toeper sent an e-mail to Collett, advising him that two doctors

had complained to her about plaintiff.  The first doctor complained that she was

attempting to dictate when plaintiff "harassed" her by repeatedly interrupting her and

demanding that she see a patient who was waiting.  This doctor also indicated that

plaintiff made false statements to her about the patient.  The second doctor complained

about the manner in which plaintiff was scheduling patients. (Toeper Dep. 56; Pl.

Exhibits, Vol.II, Ex. O).  The following day, the doctor who had felt harassed by plaintiff

sent a fax directly to Collet, complaining that plaintiff's behavior the previous day had

been "inappropriate" and "aggressive." (Pl. Exhibits, Vol. II, Ex. P).  Then on May 28,

2004, plaintiff and another employee, Kelly, argued over the setting on the office

thermostat, after which plaintiff went to Toeper's office and complained that Kelly had

threatened her.  When Toeper told plaintiff to come into her office to discuss the

situation, plaintiff began pointing her finger in Toeper's face and yelling that Toeper was

not "going to do anything about it." (Pl. Exhibits Vol. II, Ex. R)  Plaintiff's raised voice

disturbed two doctors, who complained to Toeper. (*Id.*)  One of the doctors also prepared

6

a letter, which was later sent to Collet, stating that plaintiff's behavior toward Toeper had been "embarrassing and non-professional." (Pl. Exhibits Vol. II, Ex. Q; Toeper Dep. 58-59).

A short time later that day, Toeper called Collett on the telephone, and Collett interviewed both plaintiff and Kelly regarding the incident, after which he directed Kelly to apologize to plaintiff and then go home for the day.  Collett then continued to speak to plaintiff, at which time he told her that he had received complaints regarding her work habits, and that she needed to work the scheduled hours and stop having visitors and making personal telephone calls. (Pl. Exhibits Vol. II, Ex. R)

Plaintiff left work to go on FMLA leave on or about June 2, 2004, purportedly due to stress over having to work with Dr. Zax. (Pl. Dep. 112-113)  Plaintiff was subsequently diagnosed as having depression, anxiety, and post-traumatic stress disorder. (Pl. Dep. 120)  Plaintiff's FMLA leave was originally scheduled to expire on July 5, 2004, however, Collett extended the leave to the end of August 2004. (Pl. Dep. 114, 116)

While out on leave, plaintiff filed an amended EEOC complaint, on or about June 7, 2004.  In the Amended Complaint, plaintiff stated that, after her initial EEOC complaint, IMA had retaliated against her by subjecting her to "increased scrutiny and discipline."  More particularly, she alleged that on May 27, 2004, Collett had warned her "out of nowhere" that he had received complaints about her, and that he admonished her that she needed to work the scheduled work hours and have no private phone calls.  The EEOC issued plaintiff a "right to sue" letter on July 24, 2004.

Following her FMLA leave, plaintiff returned to work on August 31, 2004, after which she contends that Toeper excessively monitored her work.  Specifically, plaintiff

contends that Toeper met with her and reiterated that she needed to come to work on time and keep personal telephone calls to a minimum.[1] (Pl. Dep. 43)  Plaintiff admits, though, that Toeper also spoke to all of the employees as a group about excessive phone use both before and after plaintiff filed her EEOC complaints. (Pl. Dep. 60)[2] On her third day back at work, September 2, 2004, several employees complained to Toeper about plaintiff taking an excessively long lunch break that day.  Toeper apparently conveyed this information to Collett, who requested that the employees put their complaints in writing.[3]

When plaintiff learned, on September 3, 2004, that a written complaint about her had been placed in her personnel file, she asked Toeper to allow her to see the complaint.  Toeper denied the request, and told plaintiff that she would have to speak with Collett as to whether or not plaintiff could see the complaint. (Pl. Dep. 123-24) After Toeper left the office for the day, plaintiff called her cell phone, and again asked about the document, to which Toeper responded, "It's in your file." (*Id.* at 124)  Plaintiff then went into Toeper's file cabinet and attempted to locate the complaint.  (*Id.*)  When she could not locate the complaint, plaintiff again called Toeper on her cell phone, and told

[1]Toeper never told plaintiff that she was completely prohibited from making personal calls. (Pl. Dep. 59) Rather, at her deposition, Toeper stated that personal calls were not prohibited, but employees were expected to "keep them to a minimum." (Toeper Dep. 52)

[2]Plaintiff later told Toeper that she had observed other employees making numerous personal calls, and Toeper said that she would "take care of it." (Pl. Dep. 44) These employees continued making personal calls, though plaintiff does not know whether that was because Toeper did not speak to them, or because they were ignoring Toeper's order. (Pl. Dep. 44, 125)

[3]Collett apparently requested that the employees make these written observations, since at least one of the written complaints states that it was prepared "per Jeff request [sic]." (Id. Ex. V)  Another employee indicated that either Toeper or Collett had asked her to provide written comments regarding plaintiff's work habits on or about September 3, 2004. (Pl. Exhibits, Vol. I, Ex. G, p. 14)

8

her that she had been looking through her file.  Toeper responded by telling plaintiff that she should not have gone into her office. (*Id*.)  On September 7, 2004, plaintiff received a verbal warning from Toeper concerning the incident.  (Pl. Dep. 124)  Plaintiff, however, denies that she did anything wrong by going through Toeper's files, since other employees also looked in their personnel files. (Pl. Dep. 126) ("We were allowed in her office, though, and we all went in our files.")  Notably, plaintiff does not contend that she had Toeper's permission to go into the personnel file. (*Id*. at 126, 129)  Instead, she contends that she had the "right" to go into the file, because Toeper had always given her documents from her file when she had asked for them previously. (Pl. Dep. 128) Moreover, plaintiff admits that IMA's employee handbook indicated that employees were not entitled to have access to their personnel files. (Pl. Dep. 134)

On September 8, 2004, during evening office hours, one of IMA's medical doctors asked plaintiff to come into an examination room and act as an interpreter for a Spanish-speaking patient.  When plaintiff attempted to shut the door as per the normal procedure, the doctor asked her  to leave the examination room door open, after which, according to plaintiff, they had a verbal dispute:

> I went to translate.  And I went to go shut the door, we don't have to shut it all the way, but he's like, "No, leave it open."  I was like, "It's policy."  He was like "I don't want anyone to accuse me of touching you."  I was like "I wouldn't do that."  He was like, you know, "I don't want you to translate for me" in front of the patient and in front of Cathy Contrino [a co-worker].

(Pl. Dep. 130)  Plaintiff, who was admittedly very upset by the doctor's comments, called her aunt, Iris Jimenez ("Jimenez"), crying, and related to her what had occurred. (Jimenez Dep. 23) Jimenez told plaintiff that she was coming to the office, where she arrived a short time later.  Since the outside door was locked, Torres "buzzed" Jimenez into the

9

waiting area.  Torres states that Jimenez appeared "very upset" and "had an attitude," (Torres Dep. 28).  Jimenez admits that she was "frustrated and incensed", and further stated: "I was mad.  I was feeling like I was ready to explode because it didn't make any sense to me." (Jimenez Dep. 27)  While standing in the waiting area, Jimenez told Torres that Toeper had "better get her A[ss] over here now," and that, "[T]his place is going down and I will bring the media because everything is wrong in the office." (Torres Dep. 28-29, 46)  Torres told both plaintiff and Jimenez that Jimenez could not come into the office area from the waiting area, but Jimenez came in anyway. (Torres Dep. 29)  Plaintiff told Jimenez to "calm down" and to leave the office, but Jimenez insisted on speaking to the doctor. (Pl. Dep. 138-39)  Plaintiff then told the doctor that Jimenez wanted to speak with him, and he came out to see her. (Torres Dep. 29)  Jimenez was aware that the doctor was with a patient at the time. (Jimenez Dep. 50)[4] Jimenez then began reprimanding the doctor for his comments to plaintiff.  Jimenez admits that she was "a little loud," but contends that she "wasn't screaming." (Jimenez Dep. 25) The doctor apologized and told Jimenez that he was attempting to protect both himself and plaintiff, and that he did not want anyone to think that they were doing something inappropriate with the door closed. (Pl. Dep. 131, 135)  Eventually Torres told both plaintiff and Jimenez that they had to leave, which they did. (Torres Dep. 30-32) Jimenez then called Toeper on the telephone and accused her of mistreating plaintiff. (Jimenez Dep. 28)

The following day, September 9, 2004, IMA terminated plaintiff's employment.  At that time, Collett issued a letter to plaintiff stating:

---

[4]According to Torres, tThere were "two or three" patients present in the office when Jimenez was confronting the doctor. (Torres Dep. 26)

> On Tuesday, September 7, 2004, you were issued a verbal warning
> regarding your unacceptable conduct on two occasions the previous week.
> On Wednesday, September 8, 2004, again you displayed unacceptable
> conduct in the office, and you allowed an unauthorized individual to enter
> IMA's Clinic and/or work area.  This conduct is unacceptable and your
> employment with IMA is being terminated immediately.

(Pl. Exhibits Vol. II, Ex. FF)

Plaintiff commenced the subject action on October 7, 2004.  The Complaint in this

action alleges four causes of action: 1) hostile work environment discrimination under

Title VII; 2) hostile work environment discrimination under the NYHRL; 3) retaliation under

Title VII; and 4) retaliation under the NYHRL.  Plaintiff contends that the retaliation took

two forms: wrongful discipline and termination.

Defendant filed the subject motion for summary judgment as to all claims.

Following submission of briefs, counsel for the parties appeared before the undersigned

for oral argument of the motion on August 17, 2006.  The Court has considered the

parties' submissions and the arguments of counsel.

ANALYSIS

*Rule 56*

Summary judgment may not be granted unless "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary

judgment bears the burden of establishing that no genuine issue of material fact exists.

*See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[T]he movant must make a

prima facie showing that the standard for obtaining summary judgment has been

satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In

moving for summary judgment against a party who will bear the ultimate burden of proof

at trial, the movant may satisfy this burden by pointing to an absence of evidence to

support an essential element of the nonmoving party's claim." *Gummo v. Village of

Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).  Once that burden has been

established, the burden then shifts to the non-moving party to demonstrate "specific facts

showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To carry this burden, the non-moving party must

present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at

249.  The parties may only carry their respective burdens by producing evidentiary proof

in admissible form. FED. R. CIV. P. 56(e).  The underlying facts contained in affidavits,

attached exhibits, and depositions, must be viewed in the light most favorable to the non-

moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Summary judgment is

appropriate only where, "after drawing all reasonable inferences in favor of the party

against whom summary judgment is sought, no reasonable trier of fact could find in favor

of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

It is well settled that the party opposing summary judgment may not create a

triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn

testimony." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)(citations omitted).

Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124

(2d Cir. 1987)(citations omitted).

12

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted). However, a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. den*. 474 U.S. 829.

*Title VII and the NYHRL*

Title VII "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Richardson v. New York State Dep't of Correctional Servs.*, 180 F.3d 426, 436 (2d Cir. 1999)(citations omitted), *abrogated on other grounds, Kessler v. Westchester County Dept. of Social Servs.*, — F.3d —, 2006 WL 2424705 (2d Cir. Aug. 23, 2006). However, "Title VII does not establish a 'general civility code' for the American workplace. Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004) (citation omitted).

It is well settled that "claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d

625, 629, n.1 (2d Cir. 1997), *cert den*. 522 U.S. 997 (1997).  Consequently, unless

otherwise noted, references to Title VII below are also intended to refer to the NYHRL.

> *Hostile Environment*

To establish a claim of hostile work environment discrimination, a plaintiff must

show that

> the harassment was sufficiently severe or pervasive to alter the conditions
> of the victim's employment and create an abusive working environment.
> The plaintiff must show that the workplace was so severely permeated with
> discriminatory intimidation, ridicule, and insult that the terms and conditions
> of her employment were thereby altered.  Proving such a claim involves
> showing both objective and subjective elements: the misconduct shown
> must be severe or pervasive enough to create an objectively hostile or
> abusive work environment, and the victim must also subjectively perceive
> that environment to be abusive.
>
> In addition, the plaintiff must show that a specific basis exists for imputing
> the objectionable conduct to the employer. Where an employee is the victim
> of sexual harassment, including harassment in the form of a hostile work
> environment, by non-supervisory co-workers, an employer's vicarious
> liability depends on the plaintiff showing that the employer knew (or
> reasonably should have known) about the harassment but failed to take
> appropriate remedial action.

*Fairbrother v. Morrison*, 412 F.3d 39, 48-49 (2d Cir. 2005) (citations and internal

quotation marks omitted).  Consequently, "when the harassment is attributable to a

co-worker, rather than a supervisor, as is the case here, the employer will be held liable

only for its own negligence." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir.

1998).  In this regard, the plaintiff has the burden of proving that

> the company either provided no reasonable avenue for complaint or knew
> of the harassment but did nothing about it.  Under Title VII, an employer
> need not have actual knowledge of the harassment; an employer is
> considered to have notice of sexual harassment if the employer-or any of its
> agents or supervisory employees-knew or should have known of the
> conduct.  The question of when an official's actual or constructive

14

knowledge will be imputed to the employer is determined by agency principles.  An official's knowledge will be imputed to an employer when: (A) the official is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company; or (B) the official is charged with a duty to act on the knowledge and stop the harassment; or (C) the official is charged with a duty to inform the company of the harassment.

*Id.* at 63-64 (citations omitted).

In this case, defendant contends that plaintiff's hostile environment claim fails for two reasons: 1) the harassment was not sufficiently severe; and 2) even if the harassment was sufficiently severe, Zax's conduct should not be imputed to IMA.  The Court disagrees with both of these points.

Defendant's argument regarding the severity of the harassment is twofold.  First, defendant contends that Zax's harassment could not have been as pervasive as plaintiff claims, because her work space was located in an open area that was visible to other employees and patients.[5]  Second, defendant contends that any harassment by Zax did not adversely affect plaintiff's working conditions, since she appeared to maintain a friendly demeanor toward him at work.  These arguments fail, since, based upon the entire record, including plaintiff's sworn testimony, there are clearly triable issues of fact concerning the extent, severity, and unwelcome nature of Zax's behavior.

As for IMA's liability, defendant contends that "no reasonable jury could conclude that IMA failed to provide employees with a reasonable avenue for complaint or otherwise failed to act despite having knowledge of Hernandez's allegations." (Def. Memo at 20).  Defendant acknowledges, of course, that plaintiff has come forward with evidentiary proof

---

[5]According to defendant, "it simply strains credulity to accept that Hernandez was subject to constant unwelcome comments or touching when her work area was in wide open view of office staff, physicians, and claimants." Def. Memo at 17.

15

in admissible form that she complained to Toeper about Zax on three separate occasions over the course of a year, and that Toeper did nothing.  However, defendant maintains that plaintiff should have complained directly to Collett, and, alternatively, that Toeper, was not sufficiently high in IMA's chain of command to hold it liable for her inaction.  As to this first argument, Collett admitted at his deposition that, pursuant to IMA's policies, plaintiff acted appropriately by complaining to Toeper, and that she was not required to complain separately to him.  Moreover, the cases cited by plaintiff in support of its argument that plaintiff was required to complain to others beside Toeper are inapposite.[6] As for the contention that Toeper, IMA's Regional District Manager, was not sufficiently high in the chain-of-command to impute liability for her actions to IMA, the Court finds that this is a triable issue of fact. *See, Vitale v. Rosina*,283 A.D.2d 141,144, 727 N.Y.S.2d 215, 218-19 (4th Dept. 2001) (Finding triable issue of fact as to whether "'upper-level supervisors had knowledge of the conduct' and either acquiesced in or condoned the harassment [about which] plaintiff had complained," where plaintiff had complained to employer's human resources director.)  That is, the Court declines to find, as a matter of law, that an individual, such as Toeper, who was a regional manager overseeing four

---

[6]For example, in *Reed v. Belknap Heating and Cooling, Inc.*, No. 01-CV-0829E(SC), 2004 WL 912877 at *6 (W.D.N.Y. Apr. 20, 2004), the plaintiff alleged that she had complied with the company's harassment policy by complaining to "a member of management," her supervisor, who was the one harassing her. *Id.* ("Plaintiff cannot rely on the fact that she had previously complained to Baumler about *his own conduct* in attempting to show compliance with Belknap's anti-harassment policy. Although plaintiff may have technically complied with the anti-harassment policy inasmuch as Baumler was a member of management, it was not reasonable for her to continue to complain to him if such complaints had not succeeded in halting *his own behavior*.") (emphasis added).  And in *Duviella v Counseling Serv.*, No. 00-CV-2424 (ILG), 2001 WL 1776158 (E.D.N.Y. Nov. 20, 2001), the plaintiff complained about her co-worker in general terms, but never told her supervisor, or anyone else, that she was being sexually harassed. *Id.* at *12 ("Duviella has not alleged that she ever told Frankel [her supervisor] or anyone at CSEDNY about the specific acts of sexual harassment, but only that she was having problems with Reeves.")

separate offices, was not an "upper-level supervisor."  In any event, Toeper admitted that

she had a duty to report allegations of sexual harassment to Collet (Toeper Dep. 22),

which is another basis by which to impute knowledge to defendant. See, *Distasio v.*

*Perkin Elmer Corp.*, 157 F.3d at 63-64 ("An official's knowledge will be imputed to an

employer when . . .  the official is charged with a duty to inform the company of the

harassment.")  Furthermore, there is evidence from which a jury could find that Toeper,

and hence IMA, ignored or condoned the harassment, by telling plaintiff that other female

employees ignored Zax's behavior, and that she should also ignore him.  Consequently,

defendant's motion for summary judgment on the hostile environment claims is denied.

### Retaliation

Plaintiff contends that defendant retaliated against her in two ways.  First, she

alleges that defendant unfairly reprimanded her in May 2004.  Second, she contends that

when she returned to work in late-August/early-September 2004, defendant unfairly

reprimanded her and then terminated her employment.

### Exhaustion of Administrative Remedies

At the outset, defendant contends that plaintiff's claim of retaliatory termination

must be dismissed, since she never filed an EEOC complaint following the termination of

her employment.  This argument is compelling, for a number of reasons.  First, while it is

undisputed that before commencing a Title VII lawsuit, a plaintiff ordinarily must exhaust

his administrative remedies, the Second Circuit, in *Butts v. City of New York Dept. of*

*Housing Preservation and Development*, 990 F.2d 1397, 1402 -1403 (2d Cir. 1993),

(abrogated by statute on other grounds, as noted in *Hawkins v. 1115 Legal Serv. Care*,

17

163 F.3d 684, 693 (2d Cir. 1998)), identified three exceptions to this rule:

> We have recognized three kinds of situations where claims not alleged in
> an EEOC charge are sufficiently related to the allegations in the charge that
> it would be unfair to civil rights plaintiffs to bar such claims in a civil action.
> We have loosely referred to these claims as "reasonably related" to the
> allegations in the EEOC charge. While the three are each animated by the
> common notion of fairness to civil rights litigants, their "reasonableness"
> derives from separate rationales.
>
> The first type of "reasonably related" claim we have recognized is
> essentially an allowance of loose pleading. Recognizing that EEOC charges
> frequently are filled out by employees without the benefit of counsel and
> that their primary purpose is to alert the EEOC to the discrimination that a
> plaintiff claims she is suffering, we have allowed claims not raised in the
> charge to be brought in a civil action where the conduct complained of
> would fall within the "scope of the EEOC investigation which can reasonably
> be expected to grow out of the charge of discrimination."
>
> The second type of "reasonably related" claim is one alleging retaliation by
> an employer against an employee for filing an EEOC charge.  In such cases
> the EEOC charge requirement is not excused because the new claims likely
> would have been discovered by the EEOC investigation. While this is
> possible, it is equally possible that the retaliation would come after the
> EEOC investigation was completed.  Rather, in such situations, we have
> relaxed the exhaustion requirement based on the close connection of the
> retaliatory act to both the initial discriminatory conduct and the filing of the
> charge itself.  The EEOC already will have had the opportunity to
> investigate and mediate the claims arising from the underlying
> discriminatory acts alleged. Due to the very nature of retaliation, the
> principle benefits of EEOC involvement, mediation of claims and
> conciliation, are much less likely to result from a second investigation.
> ***
> The third type of reasonably related claim is where a plaintiff alleges further
> incidents of discrimination carried out in precisely the same manner alleged
> in the EEOC charge.  Such an incident might not fall within the scope of the
> EEOC investigation arising from the charge, since it might occur after the
> investigation was completed . . . .  However, the values associated with
> exhaustion are not entirely lost because the EEOC would have had the
> opportunity to investigate, if not the particular discriminatory incident, the
> method of discrimination manifested in prior charged incidents.

*Id*. at 1402 -1403 (internal quotation marks omitted).

Defendant contends, however, that these last two exceptions to the exhaustion

rule identified in *Butts* were eliminated by the Supreme Court's decision in *National R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061 (2002).  In *Morgan*, the

Supreme Court held, in relevant part:

> Title 42 U.S.C. § 2000e-5(e)(1) is a charge filing provision that specifies
> with precision the prerequisites that a plaintiff must satisfy before filing suit.
> An individual must file a charge within the statutory time period and serve
> notice upon the person against whom the charge is made.
> ***
> [T]he critical sentence of the charge filing provision is: "A charge under this
> section shall be filed within one hundred and eighty days after the alleged
> unlawful employment practice occurred." § 2000e-5(e)(1) (emphasis
> added). The operative terms are "shall," "after ⋯ occurred," and "unlawful
> employment practice." "[S]hall" makes the act of filing a charge within the
> specified time period mandatory.  "[O]ccurred" means that the practice took
> place or happened in the past.  The requirement, therefore, that the charge
> be filed "after" the practice "occurred" tells us that a litigant has up to 180 or
> 300 days after the unlawful practice happened to file a charge with the
> EEOC.
> ***
> [D]iscrete discriminatory acts are not actionable if time barred, even when
> they are related to acts alleged in timely filed charges. Each discrete
> discriminatory act starts a new clock for filing charges alleging that act. The
> charge, therefore, must be filed within the 180- or 300-day time period after
> the discrete discriminatory act occurred. The existence of past acts and the
> employee's prior knowledge of their occurrence, however, does not bar
> employees from filing charges about related discrete acts so long as the
> acts are independently discriminatory and charges addressing those acts
> are themselves timely filed.

*National R.R. Passenger Corp. v. Morgan*, 122 S.Ct. at 2070, 2072; *see also, Id*. at 2076

("[F]iling a timely charge is a prerequisite to having an actionable claim."); *Id*. at 2077

("We conclude that a Title VII plaintiff raising claims of discrete discriminatory or

retaliatory acts must file his charge within the appropriate time period . . . set forth in 42

U.S.C. § 2000e-5(e)(1)").  The only exception to this filing requirement identified in

*Morgan* pertains to acts which comprise a single hostile work environment practice. *Id*. at

2073-77.

Significantly, in *Morgan*, the precise issue before the court was whether acts of discrimination occurring more than 300 days *prior to the filing of an EEOC complaint* could be considered.  Consequently, the *Morgan* decision did not involve the issue in the instant case, which is whether acts of retaliation occurring *after the filing of an EEOC complaint* need to be separately exhausted administratively.  Nonetheless, *Morgan* states very clearly that the exhaustion of all discrete claims is mandatory.  Moreover, various courts, most notably the Tenth Circuit Court of Appeals, have held that *Morgan* abrogated the second and third *Butts* exceptions. *See, e.g., Annett v. University of Kansas*, 371 F.3d 1233, 1238 (10th Cir. 2004) (Finding that in the wake of *Morgan*, discrete discriminatory acts, including retaliation, occurring after the filing of an EEOC complaint must be exhausted.)  The Second Circuit has not expressly discussed the effect, if any, of the *Morgan* decision on the exceptions identified in *Butts*.  However, in a recent decision, *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 177-78 (2d Cir. 2005), when faced with a post-EEOC filing claim of retaliation, the Second Circuit allowed the unexhausted claim to go forward, not because it alleged retaliation *per se*, but rather, because the retaliation could reasonably have been expected to fall within the scope of the investigation into the EEOC complaint.  If all three of the *Butts* exceptions had survived *Morgan*, it would have been far easier for the court in *Jute* to simply have said, pursuant to the second *Butts* exception, that post-EEOC complaint charges of retaliation

need not be exhausted.[7]   Consequently, the fact that the Second Circuit did not do so

further leads this Court to question the status of the second *Butts* exception.

However, putting such speculation aside, the Court is bound to apply the law of

this Circuit, and in that regard, the Second Circuit has, since the date of the *Morgan*

decision, reiterated that the three *Butts* exceptions still apply. *See, Terry v. Ashcroft*, 336

F.3d 128, 151 (2d Cir. 2003) (Decided after *Morgan*, indicating that all three *Butts*

exceptions remain applicable, and finding that a post-EEOC complaint retaliation claim

need not be exhausted).   Defendant suggests that the Second Circuit would have

decided *Terry* differently, but for the fact that oral argument in that case was held prior to

the issuance of the *Morgan* decision.   The Court notes, though, that, as late as May

2006, the Second Circuit affirmed a decision in which a district court, citing the *Terry*

decision, held that all three *Butts* factors remained viable. *See, Whitlow v. Visiting Nurse

Ass'n of Western New York*, 420 F.Supp.2d 92, 100 (W.D.N.Y. 2005) ("The Second

Circuit has recognized three situations in which claims raised for the first time in the

district court may be found to be "reasonably related" to allegations in an EEOC charge.")

(*citing Terry v. Ashcroft*), *aff'd*  No. 05-5335-CV, 2006 WL 1585440 (2d Cir. May 26,

2006); *see also*, *DeLuca v. Allied Domecq Quick Service Restaurants*, No. 03-CV-5142

(JFB)(AKT), 2006 WL 1662611 at *10, n. 8 (E.D.N.Y. Jun. 13, 2006) (Finding that the

second *Butts* exception still applies.); *Schiappa, Sr. v. Brookhaven Science Associates,*

---

[7]*See also, Alungbe v. Board of Trustees of Connecticut State Univ. (CSU) System*,  283
F.Supp.2d 674, 682 (D.Conn. 2003) (Analyzing, and dismissing, plaintiff's unexhausted post-EEOC-
complaint retaliation claim under the first *Butts* exception, rather than the second: "It is unlikely that the
retaliation claim against Kremens would have fallen within the scope of an EEOC investigation, because it
concerns conduct that occurred subsequent to the filing of the EEOC charge.")

*LLC*, 403 F.Supp.2d 230, 235 (E.D.N.Y. 2005) (Applying second *Butts* exception);

*Fleming v. Verizon New York, Inc.*, 419 F.Supp.2d 455, 462-63 (S.D.N.Y. 2005) (Applying

second *Butts* exception).   Accordingly, defendant's motion to dismiss the retaliatory

termination claim as unexhausted is denied, pursuant to the second "reasonably related"

exception identified in *Butts*, since plaintiff alleges that she was fired in retaliation for filing

EEOC complaints.[8]

*Consideration of the Retaliation Claim on the Merits*

To establish a prima facie case of retaliation under Title VII, "a plaintiff must

demonstrate participation in protected activity known to the defendant, an employment

action disadvantaging the person engaged in the protected activity, and a causal

connection between the protected activity and the adverse employment action." *Cruz v.*

*Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (citations and internal quotations

omitted).  Making a complaint regarding harassment to one's supervisor is "protected

activity" under Title VII. *Id*.

Retaliation claims are analyzed using the three-tier burden-shifting test "set forth in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),

and its progeny." *Valentine v.Standard & Poors*, 50 F.Supp.2d 262, 281-82 (S.D.N.Y.

1999)(Citations and internal quotations omitted), *aff'd*, 205 F.3d 1327 (2d Cir. 2000);

*Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001), *cert den.* 534

---

[8]The Court does not believe that the termination claim is reasonably related under the first or third *Butts* exceptions.  For example, the Court does not believe that the termination would reasonably have fallen within the scope of the EEOC's investigation, since the EEOC charges gave no indication that plaintiff was in danger of being terminated, the incident involving Toeper's file cabinet and the Sirotenko incident could not have been anticipated when plaintiff filed her EEOC complaints, and the EEOC had already issued a right to sue letter by the time defendant terminated plaintiff's employment.

U.S. 993 (2001).  Under the first tier of the *McDonnell Douglas* test, the plaintiff must

establish a prima facie case.[9]  If the plaintiff establishes a prima facie case,

> the burden shifts to the employer to articulate some legitimate,
> nondiscriminatory reason for the employee's discharge [or other adverse
> employment action].  At this stage, the employer need only articulate--but
> need not prove-- the existence of a nondiscriminatory reason for its
> decision. If the defendant carries this burden of production, the presumption
> raised by the prima facie case is rebutted, and the factual inquiry proceeds
> to a new level of specificity.  Once defendant meets its burden of
> production, the burden shifts back to plaintiff. Under the third tier of the
> *McDonnell Douglas* test, plaintiff bears the ultimate burden of proving that
> the reason proffered by the employer is a pretext for unlawful
> discrimination.  In order to survive a motion for summary judgment, plaintiff
> must establish a genuine issue of material fact as to whether the employer's
> reason . . .  is false and as to whether it is more likely that a discriminatory
> reason motivated the employer to make the adverse employment decision.

*Valentine*, 50 F.Supp.2d at 281-82 (Citations and internal quotations omitted); *see also,*

*Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir.  2003).

At the third tier of the McDonnell Douglas test, simply proving that the employer's

proffered reason was false may, or may not, establish the required proof of discriminatory

intent:

> The ultimate question is whether the employer intentionally discriminated,
> and proof that "the employer's proffered reason is unpersuasive, or even
> obviously contrived, does not necessarily establish that the plaintiff's
> proffered reason is correct.  In other words, it is not enough to disbelieve
> the employer; the factfinder must believe the plaintiff's explanation of
> intentional discrimination.

*James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000) (*quoting Reeves v.*

*Sanderson Plumbing Prods. Inc.*, 120 S.Ct. 2097, 2108-09 (2000)).  In this regard, "[t]he

---

[9]It is clear that "the burden of proof that must be met to permit an employment-discrimination
plaintiff to survive a summary judgment motion as the prima facie stage is *de minimis*." *Chambers v. TRM
Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (emphasis in original, citation and internal quotation
marks omitted).

relevant factors . . . include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports or undermines the employer's case." *Id*. (internal quotation marks omitted).

It is undisputed here that plaintiff engaged in protected activity when she complained both to IMA and to the EEOC, and that defendant was aware of the protected activity.  Defendant maintains, however, that plaintiff has failed to make a prima facie showing that she suffered an adverse employment action, or if she did, that there was a causal connection between the complaint and the adverse action.

To make a prima facie showing of an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kessler v. Westchester County Dept. of Social Services*, — F.3d --- 2006 WL 2424705 at *8 (*citing Burlington Northern & Santa Fe Railway Co. v. White*, --- U.S. ----, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)). In this regard, "[w]hether a particular reassignment [or other employment action] is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id*. at *10.

Applying these principles to the facts of this case, the Court finds, first, that the allegedly retaliatory treatment which occurred in May 2004 does not amount to an adverse employment action.  At most, Collett reminded plaintiff to follow the company's rules regarding work hours and telephone calls, and Toeper sent e-mails to Collett

24

regarding plaintiff's work performance.  These actions had no real adverse impact on plaintiff.  The Court cannot say that these actions would have dissuaded a reasonable person from making or supporting a charge of discrimination, especially since they did not deter plaintiff from filing her amended EEOC complaint.

On the other hand, the alleged retaliation occurring in September 2004 would amount to an adverse employment action.  More specifically, defendant terminated plaintiff's employment, and the verbal and written reprimands that plaintiff received in September 2004 were relied upon by defendant in making that determination.  A rational factfinder could permissibly infer that a reasonable employee in plaintiff's position could be dissuaded from making a charge of discrimination if doing so would result in the termination of her employment.

Defendant next argues that plaintiff has failed to demonstrate a causal connection between her protected activity and the decision to terminate her employment.  It is well settled that "[a] causal connection may be established either indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991) (internal quotation marks omitted).  Here, the Court finds that plaintiff has made a prima facie showing of a causal connection.  That is, plaintiff has come forward with evidence that, immediately following her EEOC complaint, defendant began treating her differently than other employees, and differently than it ever had before, by preparing a "paper trail" of her various infractions.  In this regard, while the Court has already ruled that the disciplinary

25

events which occurred in May 2004 were not adverse employment actions, plaintiff may

nonetheless use them as evidence of a causal connection between her protected activity

and the termination of her employment.  Moreover, the Court rejects defendant's

contention that the passage of time, three months, between the protected activity and the

termination of plaintiff's employment, necessarily negates any inference of a causal

connection, since plaintiff was out of work on FMLA leave during most of that period.

For all of the foregoing reasons, the Court finds that plaintiff has made out a prima

facie case.  Moving on to the second tier of the *McDonnell Douglas* test, the Court finds

that defendant has met its burden of coming forward with legitimate non-discriminatory

reasons for terminating plaintiff's employment.  Namely, during her first week back at

work, plaintiff took an excessively long lunch break, she went into Toeper's files without

permission, she became involved in a dispute with a doctor over the doctor's request to

leave the exam room door open, and she then allowed her aunt to make a scene in the

office by confronting the doctor.

At the third tier of the *McDonnell Douglas* test, plaintiff contends that she has

carried her burden of creating a triable issue of fact as to whether these reasons are

false, and that defendant's real reason for terminating her was retaliatory animus.  In this

regard, she relies primarily on the fact that defendant only began documenting her

disciplinary infractions after she filed her EEOC complaint, and did not document other

employees' infractions.  Further, she maintains that she should not have been disciplined

for going into Toeper's files, because she had Toeper's permission.  Finally, she

contends that she should not have been blamed for Jimenez's behavior at the office,

because she did not actually "buzz" her aunt through the locked door that evening, and

because other employees were permitted to have guests on the premises without permission.  However, the Court finds that these arguments are unpersuasive.

First, the fact that defendant began keeping written records on plaintiff following her EEOC complaint, while not doing so for other employees, does not tend to show that the reasons given for firing her are false.  In fact, plaintiff does not dispute that she had numerous personal calls, took a long lunch (with permission), was the subject of complaints by doctors, went into Toeper's file, and permitted her aunt to verbally confront one of the doctors.  Rather, she contends that the lunches and personal calls could not have been the true reason for terminating her, because defendant allowed other employees to make personal calls and take long lunches.  If extended lunches and phone calls were the only reasons given for terminating plaintiff's employment, the Court might be inclined to agree that plaintiff had carried her burden, at least as to falsity.  However, it is clear that defendant had ample reasons to fire plaintiff apart from these.

For example, it is clear that plaintiff went into Toeper's personnel files without permission.  Plaintiff suggests otherwise, based upon Toeper's comment, taken out of context, that the complaint was "in your file."  Alternatively, she contends that she "had a right" to see her personnel file.  However, it is clear from plaintiff's own testimony that Toeper had told her that she could not see the complaint, and that permission to see the document could only come from Collett.  Despite that, plaintiff went into Toeper's office and attempted to locate the complaint.  Defendant could have terminated plaintiff's employment for this reason alone.

Subsequently, following her dispute with the doctor over leaving the exam room door open, plaintiff called Jimenez, who came to the office and began to yell that Toeper

27

had better "get her ass out here," and that the company was "going down."  Moreover, after loudly confronting the doctor, Jimenez called Toeper and accused her of mistreating plaintiff.  Plaintiff contends that she was not to blame, because Torres actually "buzzed" Jimenez through the office's locked outer door.  Even assuming that is true, defendant was nonetheless entitled to terminate plaintiff's employment because of her involvement in the incident. *Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000) ("We have held generally that insubordination and conduct that disrupts the workplace are legitimate reasons for firing an employee. . . .  An employer does not violate Title VII when it takes adverse employment action against an employee to preserve a workplace environment that is governed by rules, subject to a chain of command, free of commotion, and conducive to the work of the enterprise.") (citations omitted); *see also, DeLuca v. Allied Domecq Quick Service Restaurants*, 2006 WL 1662611 at *9 ("An 'employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'")(*quoting Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir.1984)).  Moreover, even if other employees had guests on the premises without authorization, there is no indication that these other guests acted disruptively while there.  Plaintiff simply has not come forward with evidence showing that these reasons given for her termination were false, or that the real reason for her termination was retaliatory animus.  Accordingly, defendant is entitled to summary judgment on plaintiff's retaliation claims.

CONCLUSION

Defendant's motion [#23] for summary judgment is granted in part and denied in part.  The application is granted with regard to plaintiff's retaliation claims, and is denied as to plaintiff's hostile work environment claims.

SO ORDERED.

Dated: Rochester, New York
          September 14, 2006

ENTER:


 /s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge